Filed 7/31/26  P. v. Thomas CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>DOMINIC JACQUES THOMAS,<br><br>        Defendant and Appellant. | B343851<br><br>(Los Angeles County<br>Super. Ct. No. TA160024) |

        APPEAL from a judgment of the Superior Court of Los Angeles County, Deborah S. Brazil, Judge.  Affirmed.

        Christopher Love, under appointment by the Court of Appeal, for Defendant and Appellant.

        Rob Bonta, Attorney General, Charles G. Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Nicholas J. Webster, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

A jury convicted defendant Dominic Jacques Thomas of one count of second degree murder (Pen. Code, § 187, subd. (a))[1] for fatally stabbing Jesse May. Thomas challenges his conviction, arguing there was no substantial evidence that he acted with implied malice. He also contends that the trial court erred by refusing to instruct the jury on involuntary manslaughter, that the court incorrectly instructed the jury on implied malice, and that his attorney rendered ineffective assistance by failing to request an instruction on a defendant's right to use deadly force in response to the victim's use of deadly force. We find no reversible error, and we affirm.

## FACTS AND PROCEEDINGS BELOW

Thomas killed May shortly after 1:00 a.m. on April 19, 2023, in a parking lot of the Nickerson Gardens housing project in Watts. No one came forward to the police with information about the murder, and as a result, the principal evidence in the case came from surveillance video footage. The silent footage shows Thomas, May, and several other people hanging out in the parking lot beginning at 1:00 a.m. For the first 20 minutes of the video, Thomas and May remain in the parking lot and occasionally speak with one another, but there is no obvious rancor between the two.

At 1:21 a.m., according to the time stamp on the surveillance video, May begins walking away from the parking lot, but Thomas continues looking in his direction. A few seconds later, May stops and turns back toward Thomas, as if to respond to something Thomas has said. May walks back toward Thomas,

_____

[1] Subsequent statutory references are to the Penal Code.

2

and the two circle one another.  A third man, who has been standing nearby, sees a potential fight developing, walks toward Thomas and May, and stands between them.  The man puts his hand on Thomas's chest and pushes him back.  While this is occurring, May begins taking off his jacket as if preparing for a fight.  Both Thomas and May step to the side so that the third man's body is not between them, and Thomas pushes the third man's arm aside.  May and Thomas move toward each other, and May puts his arm up as if taking a swing at Thomas, but before he lands any blow Thomas (who already has a knife in his hand) lunges at May and stabs him.  Blood begins dripping from May almost immediately as he turns and stumbles away.  May collapses against the hood of a car and falls to the ground, less than a minute after the encounter began and less than 20 seconds after Thomas stabbed him.

The police arrived on the scene a few minutes later.  In the interim, Thomas remained in the parking lot.  He walked over to the area where May had fallen and stood over him, but he did not attempt to render aid.  A police officer performed CPR on May but was unable to revive him.  The officer testified that he did not find a weapon on May.

An officer who worked in the area and had known Thomas for several years identified him in the surveillance video as the stabber.  In addition, DNA evidence of clothing recovered near the crime scene connected Thomas to the killing.  Officers reviewed additional surveillance video footage showing an unidentified man throwing a bag onto the roof of another building in the housing project at around 2:00 a.m. on the night of the stabbing.  The officers searched the roof the following morning and recovered a bag containing clothing similar to that worn by

the stabber in the video, including a distinctive leather aviator hat with a fur lining. Criminalists tested samples of genetic material from these items and found that the samples from the hat, a jacket, and a pair of pants matched Thomas's DNA. Samples from two red stains on the pants matched both Thomas's and May's DNA.

A forensic pathologist testified that she conducted May's autopsy and determined he died of a stab wound about three and one-half inches deep. The wound, which was located near the top of May's left thigh a few inches away from his groin, severed May's left femoral artery and left femoral vein, causing him to die of blood loss within a matter of minutes.

Thomas called no witnesses. At closing argument, defense counsel did not deny that Thomas stabbed May but argued that he acted in self-defense, as May was physically much larger than Thomas. In the alternative, Thomas's attorney argued Thomas was guilty of no more than voluntary manslaughter under a theory of imperfect self-defense or provocation.

The jury found Thomas guilty of second degree murder, and the trial court found true an allegation that he had suffered one prior conviction for voluntary manslaughter, a strike offense. The court sentenced Thomas to 31 years in prison: 15 years for second degree murder, doubled because of the prior strike conviction, plus one year under section 12022, subdivision (b)(1) for using a deadly or dangerous weapon in the commission of the offense.

## DISCUSSION

### A. Substantial Evidence Supported the Conviction of Second Degree Murder

Thomas contends we must reverse his conviction for second degree murder because there was insufficient evidence that he acted with implied malice. "Murder is committed with implied malice when 'the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " ' " (*People v. Reyes* (2023) 14 Cal.5th 981, 988.)

"Our task in deciding a challenge to the sufficiency of the evidence is a well-established one. '[W]e review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. . . .' [Citation.] ' "An appellate court must accept logical inferences that the jury might have drawn from the evidence even if the court would have concluded otherwise." ' " (*People v. Solomon* (2010) 49 Cal.4th 792, 811-812.)

Thomas argues there was no substantial evidence as to either the objective or subjective components of implied malice. On the objective test, he claims the prosecution failed to show that the stabbing " 'involve[d] a high degree of probability that it [would] result in death' " (*People v. Knoller* (2007) 41 Cal.4th 139, 152) because "[t]he prosecution presented no evidence to establish that thigh wounds are objectively likely to result in death." According to Thomas, "[t]he prosecution presented no

5

evidence other than that May died."**2**  Thomas also argues the prosecution failed to prove the subjective aspect of implied malice, i.e., that he "acted with conscious disregard of the danger to human life" (*id*. at p. 156), because "[t]here is no evidence showing that [he] understood or appreciated that his act of stabbing May had a high probability it would result in death. There was no evidence presented suggesting that [Thomas] had any knowledge of anatomy."

---

**2** Thomas cites an online report for the proposition that "thigh wounds are rarely fatal."  This web page was not introduced as evidence at trial.  In his reply brief, he cites several additional studies that he claims support the same conclusion, and he requests we take judicial notice of all these documents. We decline the request for judicial notice.  Thomas argues that "we may take judicial notice of scientific facts." (*Brown v. Smith* (2018) 24 Cal.App.5th 1135, 1142.)  If Thomas wanted to present evidence regarding the dangerousness of thigh wounds in general or of the specific wound that caused May's death, the time to do so was at trial:  "It has long been the general rule and understanding that 'an appeal reviews the correctness of a judgment as of the time of its rendition, upon a record of matters which were before the trial court for its consideration.'  [Citation.] This rule reflects an 'essential distinction between the trial and the appellate court . . . that it is the province of the trial court to decide questions of fact and of the appellate court to decide questions of law . . . .' " (*In re Zeth S.* (2003) 31 Cal.4th 396, 405.) By waiting until appeal, Thomas also has deprived the People of a full and fair opportunity to respond before the jury.  Our Supreme Court has made clear "that an appellate court should not take notice of matters not first presented to and considered by the trial court, where to do so would unfairly permit 'one side to press an issue or theory on appeal that was not raised below.' " (*People v. Sakarias* (2000) 22 Cal.4th 596, 636.)

We find these arguments unpersuasive. " 'It is settled that the necessary element of malice may be inferred from the circumstances of the homicide.' " (*People v. Bloyd* (1987) 43 Cal.3d 333, 349.) In this case, the circumstances include not just the specific place where the knife landed, but that Thomas lunged at May with a knife with the evident goal of stabbing him. We are aware of no case where a court held that this type of action did not objectively involve a high probability of death, and Thomas identifies none. To the contrary, in *People v. Cravens* (2012) 53 Cal.4th 500, our Supreme Court held that a single very hard punch met this standard. (*Id.* at p. 508.) As Justice Liu stated in his concurring opinion in that case, "an act that will certainly lead to death is not required" to meet the objective standard of implied malice. What matters is that "the probability of death from the act [is] more than remote or merely possible." (*Id.* at p. 513 (conc. opn. of Liu, J.); accord, *People v. Reyes*, *supra*, 14 Cal.5th at p. 989 ["the defendant's act must not merely be dangerous to life in some vague or speculative sense"].)

Nor does the lack of direct evidence as to Thomas's mental state at the time of the stabbing preclude a finding that he " ' " 'act[ed] with conscious disregard for life.' " ' " (*People v. Reyes*, *supra*, 14 Cal.5th at p. 988.) "[R]arely would a defendant provide direct evidence" of his mental state at the time of a killing, and thus, as with all elements of a crime, " 'implied malice may be proven by circumstantial evidence.' " (*People v. Superior Court (Valenzuela)* (2021) 73 Cal.App.5th 485, 502.) The relevant question is not (as Thomas claims) whether the defendant "had any knowledge of anatomy" or of "where in the thigh the veins and arteries were," but rather whether a jury could reasonably infer that Thomas understood that there was a

high probability that lunging at May and stabbing him would kill him. The answer to that question is yes. " 'When it is proved that [the] defendant assaulted [the] decedent with a dangerous weapon in a manner endangering life and resulting in death and the jury concludes that the evidence did not create in their minds a reasonable doubt whether [the] defendant's act may have been justified or its criminal character mitigated by the influence of passion [citation] . . . then no further proof of malice or of intent to kill is required to support a verdict of guilty of second degree murder.' " (*Jackson v. Superior Court* (1965) 62 Cal.2d 521, 526; accord, *People v. Cravens*, *supra*, 53 Cal.4th at p. 511 ["the jury was entitled to infer [the] defendant's subjective awareness that his conduct endangered [the victim's] life from the circumstances of the attack alone"].) Thomas's behavior after the stabbing is also relevant. He did not attempt to render aid or go for help. Instead, he stood over May's body and lingered at the scene for several minutes. (See *Cravens*, *supra*, at p. 511 [the defendant's failure to check on the victim's condition or seek assistance "bolstered the finding of implied malice"].)

B.   **The Trial Court Did Not Err Prejudicially in Refusing to Instruct the Jury on Involuntary Manslaughter**

At trial, Thomas requested the court instruct the jury on involuntary manslaughter as a lesser included offense. Section 192 defines involuntary manslaughter as "the unlawful killing of a human being without malice" (*ibid.*) "in the commission of an unlawful act, not amounting to a felony" (*id.*, subd. (b)). The trial court reasoned that the facts did not support an inference that Thomas stabbed May in the course of committing an unlawful act less than a felony and accordingly denied Thomas's request.

8

Thomas contends this was error because the scope of involuntary manslaughter extends farther than the text of the statute indicates. Courts have held that "an unlawful killing in the course of an inherently dangerous assaultive felony without malice" can be involuntary manslaughter (*People v. Brothers* (2015) 236 Cal.App.4th 24, 33), and that "an instruction on involuntary manslaughter as a lesser included offense must be given when a rational jury could entertain a reasonable doubt that an unlawful killing was accomplished with implied malice during the course of an inherently dangerous assaultive felony" (*id.* at p. 34).[3]

We agree with Thomas that the court misinterpreted the scope of involuntary manslaughter, but not that this amounted to prejudicial error. The failure to instruct on a lesser included offense "if there was substantial evidence that [the] defendant[] committed the lesser, but not the greater offense" (*People v. Gonzalez* (2018) 5 Cal.5th 186, 197) is an error of state law, which

---

[3] Justice Kennard explained this apparently anomalous result in her concurring opinion in *People v. Bryant* (2013) 56 Cal.4th 959. In short, a broad interpretation of involuntary manslaughter is necessary to avoid an absurd result in which a defendant who kills without malice in the commission of an assaultive felony could escape punishment for homicide. Under the merger doctrine, such defendant cannot be convicted of felony murder. (*Id.* at p. 973, fn. 3 (conc. opn. of Kennard, J.).) If involuntary manslaughter did not apply to deaths resulting from assaultive acts, "a defendant who killed in the commission of a *less* serious unlawful act (i.e., a misdemeanor) could be convicted of involuntary manslaughter, but a defendant who killed in the commission of a *more* serious unlawful act (i.e., a felony) could not." (*Id.* at p. 974 (conc. opn. of Kennard, J.).)

"is harmless if [the] defendant[] cannot demonstrate a reasonable probability that the jury would have—without the error—reached a different result." (*Id.* at p. 191.) Regardless of whether there was substantial evidence to support an instruction on involuntary manslaughter (an issue over which the parties disagree), Thomas has failed to show he was prejudiced by the court's refusal.

"The prejudice arising from the failure to instruct on lesser included offenses . . . creates a specific kind of risk—that the jury, faced with an all-or-nothing choice between . . . murder or acquittal, convicted [the] defendant[] of . . . murder even though the prosecution failed to satisfy its burden." (*People v. Gonzalez*, *supra*, 5 Cal.5th at p. 191.) That risk is minimized here, where the jury was instructed on a different lesser included offense, namely voluntary manslaughter. "Manslaughter is the unlawful killing of a human being without malice" (§ 192), and the question of whether Thomas acted with malice, i.e., whether he intended to kill May or acted with conscious disregard to his life, was at the center of the case, as reflected in both sides' closing arguments. The jury decided that issue when it convicted Thomas of murder within one afternoon of deliberation.[4] If the jurors had a reasonable doubt as to whether Thomas acted with malice, they could have convicted him of voluntary manslaughter. It is not reasonably probable that the same jury would have selected the even lesser offense of involuntary manslaughter if given an opportunity. (See *People v. Rogers* (2006) 39 Cal.4th

---

[4] The record does not establish how long the jury deliberated, but the jurors began their deliberations at 2:05 p.m. and returned with a verdict the same afternoon.

10

826, 884 [because the jury was instructed on voluntary manslaughter, any error in failing to instruct on involuntary manslaughter was harmless].)

**C.    The Court Did Not Err in Instructing the Jury on Implied Malice**

Thomas contends the trial court erred by instructing the jury incorrectly on the mental state required for implied malice. Thomas bases his argument on a change in the pattern instruction on implied malice that was instituted after his trial. The court instructed the jury on implied malice based on the CALCRIM No. 520 pattern instruction in effect at the time of Thomas's trial in January 2025.  The instruction read as follows:

"The defendant had implied malice if [(italics omitted)]:

"1.    He intentionally committed the act;

"2.    The natural and probable consequences of the act were dangerous to human life *in that the act involved a high degree of probability that it would result in death* [(italics added)];

"3.    At the time he acted, he knew his act was dangerous to human life;

"AND

"4.    He deliberately acted with conscious disregard for human life."

In October 2025, the CALCRIM instruction was revised to move the text italicized above from paragraph 2 to the end of the instruction.  The new version of the pattern instruction reads as follows:

"The defendant had implied malice if [(italics omitted)]:

"1.    (He/She) intentionally (committed the act/[ or] failed to act);

11

"2.     The natural and probable consequences of the (act/[ or] failure to act) were dangerous to human life;

"3.     At the time (he/she) (acted/[ or] failed to act), (he/she) knew (his/her) (act/[ or] failure to act) was dangerous to human life;

"AND

"4.     (He/She) deliberately (acted/[ or] failed to act) with conscious disregard for (human/[ or] fetal) life.  [¶] . . . [¶]

"*An (act/[ or] failure to act) is dangerous to human life if it involved a high degree of probability that it would result in death.*"  (Italics added.)

Thus, the pattern instruction was changed to move the language defining the term "dangerous to human life" from inside paragraph 2 to the end of the instruction.  In Thomas's view, this change is significant because "the instruction now clarifies that '[a]n act is *dangerous to human life* if it involved a high degree of probability that it would result in death' whenever that phrase is used," whereas the previous version of the instruction suggested that definition applied only to the objective element of implied malice.

Thomas forfeited this argument by failing to object to the instruction before the trial court.  If the trial court issues jury instructions that misstate or omit the elements of an offense, the defendant may bring a challenge on appeal even if he did not object before the trial court.  (*People v. Flood* (1998) 18 Cal.4th 470, 482 & fn.7.)  But if the instructions accurately stated the law, a defendant may not claim that the court erred by failing to issue additional or clarifying instructions unless he requested the instruction from the trial court.  (*People v. Guerra* (2006) 37

Cal.4th 1067, 1134, disapproved on another ground in *People v. Rundle* (2008) 43 Cal.4th 76, 151.)

The former version of CALCRIM No. 520 accurately stated the law on implied malice despite the subsequent revision. The amendment merely clarified a point already present in the law and in the former version of the instruction. In *People v. Nieto Benitez* (1992) 4 Cal.4th 91, our Supreme Court upheld an earlier pattern instruction against a similar challenge. The court reasoned "that the two linguistic formulations—'an act, the natural consequences of which are dangerous to life' and 'an act [committed] with a high probability that it will result in death' are equivalent and are intended to embody the same standard." (*Id.* at p. 111.) An instruction that used only the first formulation, with no mention of a high probability of death, thus correctly stated the law. Thomas argues that the Supreme Court called *Nieto Benitez* into question in *Reyes*, where the court stated that, "To suffice for implied malice murder, the defendant's act must not merely be dangerous to life in some vague or speculative sense; it must ' "involve[] a high degree of probability that it will result in death." ' " (*People v. Reyes*, *supra*, 14 Cal.5th at p. 989, quoting *People v. Knoller*, *supra*, 41 Cal.4th at p. 152.) But in the very next breath, the *Reyes* court quoted *Knoller* with approval for the proposition that "under the objective component of implied malice, ' " 'dangerous to life' " ' means the same thing as a ' "high degree of probability that" ' the act in question ' "will result in death" ' " (*Reyes*, *supra*, at p. 989, quoting *Knoller*, *supra*, at p. 152). There is thus no indication that the Supreme Court in *Reyes* meant to change the fundamental formulation of implied malice, nor that the Judicial Council's recent amendment

13

to CALCRIM No. 520 was intended to correct a legal error in the former version of the instruction.

Because the jury instructions correctly stated the law on implied malice, and Thomas did not request a clarifying instruction, he forfeited the claim on appeal. Even if the court's instruction on implied malice was erroneous, the error was harmless because "[w]e find no reasonable likelihood the jury would interpret the instruction as stating that" (*People v. Guerra, supra*, 37 Cal.4th at p. 1134) it need not find that Thomas knew there was a high probability his action would result in death.

**D.  Thomas's Attorney Did Not Render Ineffective Assistance by Failing to Request an Instruction on the Right to Respond to Deadly Force**

As part of the jury instructions on self-defense, the trial court told the jury, pursuant to CALCRIM No. 3472, that "[a] person does not have the right to self-defense if he provokes a fight or quarrel with the intent to create an excuse to use force." Thomas argues his attorney rendered ineffective assistance by failing to ask the court to include an additional sentence, which appears in brackets in CALCRIM No. 3472: "[However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend (himself/herself) with deadly force and was not required to try to stop fighting.]"

To establish a claim of ineffective assistance of counsel, "the defendant must show [both] that counsel's representation fell below an objective standard of reasonableness" (*Strickland v. Washington* (1984) 466 U.S. 668, 688 [104 S.Ct. 2052, 80 L.Ed.2d 674]), and "that the deficient performance prejudiced the defense"

14

(*id.* at p. 687).  Thomas's claim fails the first requirement because there was no evidence that May acted with sudden and deadly force, nor that Thomas could not withdraw.  May was unarmed.  Thomas argues that May, who was much larger than Thomas and weighed over 300 pounds, used deadly force by trying to punch Thomas immediately before the stabbing.  Although a punch could potentially constitute deadly force for purposes of the instruction, this is not such a case.  The video shows May flailing his arm at Thomas just before Thomas stabbed him, but it also shows May did not have his feet firmly planted in a way that would allow him to deliver any punch with significant force.  In addition, a third man was standing between Thomas and May and apparently trying to separate the two.  Thomas could have remained behind the third man, thereby preventing May from punching him with any power.  The presence of the third man also gave Thomas a greater opportunity to "withdraw from the fight" by fleeing toward the open space behind him.  (CALCRIM No. 3472.)  Thomas could have easily done so; May was quite obese and does not move particularly fast at any point during the video.  Thomas made no attempt to withdraw, but rather lunged at May.  Thomas's attorney did not render ineffective assistance by failing to request this instruction because there was no evidence to support issuing the instruction.

## DISPOSITION

The judgment of the trial court is affirmed.

NOT TO BE PUBLISHED

WEINGART, J.

We concur:

BENDIX, Acting P. J.

M. KIM, J.

16